# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: April 27, 2022

| | |
|---|---|
| * * * * * * * * * * * * *<br>THOMAS CREELY,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>      Respondent.<br>* * * * * * * * * * * * * | UNPUBLISHED<br><br>No. 18-1434V<br><br>Special Master Gowen<br><br>Ruling on Damages; Influenza<br>("Flu") Vaccine; Guillain-Barre<br>Syndrome ("GBS"). |

*Renee Ja Gentry,* The Law Office of Renee J. Gentry, Washington, DC, for petitioner.
*Tyler King,* U.S. Department of Justice, Washington, D.C., for respondent.

## RULING ON DAMAGES[1]

On September 20, 2018, Thomas Creely ("petitioner") filed a petitioner for compensation in the National Vaccine Injury Compensation Program.[2] Petition (ECF No. 1). Petitioner alleged that he suffered from Guillain-Barre Syndrome ("GBS") as a result of receiving an influenza ("flu") vaccination on February 2, 2017. *Id.* at Preamble. On November 21, 2019, respondent filed his Rule 4(c) report in which he conceded that Petitioner is entitled to compensation. (ECF No. 31). On November 25, 2019, a Ruling on Entitlement was issued, finding that petitioner had established that he suffered a Table GBS and was entitled to compensation. *See Creely v. Sec'y of Health & Hum. Servs.,* No. 18-1434V, 2019 WL 7482161, at *1 (Fed. Cl. Nov. 25, 2019) (ECF No. 32).

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this opinion contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims. The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. **This means the opinion will be available to anyone with access to the Internet.** Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). An objecting party must provide the court with a proposed redacted version of the opinion. *Id.* **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act"). Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Following a full review of all the evidence submitted, I find that petitioner should receive an award for past pain and suffering in the amount of $250,000.00.  The basis for this determination is detailed below.[3]

## I. Relevant Procedural History

On November 21, 2019, respondent filed the Rule 4(c) report in which respondent recommended compensation. Respondent's ("Resp.") Report (ECF No. 31). The Ruling on Entitlement was filed on November 25, 2019, and Chief Special Master Corcoran ruled that petitioner was entitled to compensation. (ECF No. 32). The case entered the damages phase the same day. (ECF No. 33).

On March 16, 2022, a status conference was held and the only remaining issue in dispute was the compensation for pain and suffering and emotional distress pursuant to § 15(a)(1)(4). On March 18, 2022, petitioner filed a status report indicating that petitioner would be unable to participate in a hearing and requested that I make a determination on pain and suffering. (ECF No. 90). Additionally, petitioner instructed his counsel to accept the Respondent's life care plan. *Id*. On March 18, 2022, I ordered petitioner to file any additional materials and to file a brief by March 28, 2022, with respondent's reply due ten days later. March 18, 2022, NON-PDF Scheduling Order.  On March 18, 2022, petitioner filed a memorandum in support of petitioner's motion for findings of act and conclusions of law regarding damages, and stated that due to the length of the proceedings petitioner would accept respondent's proffer with respect to the life care plan. (ECF No. 91).  On March 28, 2022, respondent filed a motion for extension of time to file respondent's brief on damages. (ECF No. 92). I granted the extension on March 28, 2022. Order NON-PDF, March 28, 2022. On April 4, 2022, respondent filed his brief on pain and suffering. (ECF No. 93).

The matter is now ripe.

## II.  Relevant Factual History

Petitioner was born on October 5, 1942, and his medical history included left knee degenerative joint disease, pulmonary fibrosis, diabetes, hyperlipidemia, right sciatica, cataracts, diverticula, shingles, fatigue, and obesity. Pet. Ex. 12 at 120; Pet. Ex. 19 at 12.  Prior to the February 2, 2017, flu vaccination, petitioner led an active life as a 74-year-old.  He operated a pizza shop seven days a week, performing all responsibilities including food preparation, cooking, deliveries, front counter, and inventory control. Pet. Ex. 2. Pet. Affidavit ("Aff.") ¶ 1. On January 31, 2017, petitioner was hospitalized for a total knee replacement and after his doctor advised him on the successful surgery, he was scheduled to be discharged for physical therapy. Pet. Ex 12 at 792; Pet. Aff. ¶ 2.  On February 2, 2017, petitioner received the flu vaccination in question while hospitalized at UPMC Passavant Hospital in Pittsburgh, Pennsylvania. Pet. Ex. 1; Pet. Aff. ¶ 2.

---

[3] Pursuant to §300aa-13(a)(1), in order to reach my conclusion, I considered the entire record, including all of the medical records, statements, expert reports, medical literature and testimony presented at the entitlement hearing submitted by both parties.  This opinion discusses the elements of the record I found most relevant to the outcome.

On February 3, 2017, petitioner was transferred to St. John's Lutheran Care Center, an inpatient rehabilitation facility, for physical therapy and stayed there until February 16, 2017, when he began receiving the physical therapy at home. Pet. Ex. 10 at 5, 16, 20; Pet. Ex. 4; Pet. Aff. ¶ 3. Petitioner stated that "[w]ithin a couple days, [he] started to experience tingling, numbness, and pain in [his] legs and feet, a severe headache, and severe back pain." Pet. Aff. ¶ 3. On February 17, 2017, while at home, a visiting nurse was concerned about petitioner's "elevated BP, headache, and blurred vision in left eye" and contacted Dr. Wusylko. Pet. Ex. 9 at 44; Pet. Aff. ¶ 4. It is noted that "per nurse the physician would like [patient] to go to ER for evaluation." *Id*.

On February 22, 2017, the visiting nurse notes "patient's wife called crying that he needs to return to St. John's because he keeps falling." Pet. Ex. 9 at 45. On February 22, 2017, petitioner called emergency medical services with complaints of progressive weakness in both legs for the past few days to the point that he could not walk without falling and was admitted to Passavant Hospital. *Id*. at 46; Pet. Ex. 12 at 547. Petitioner reported symptoms of "generalized and diffuse weakness over the past few days," and "feeling very weak and achy," and "has fallen multiple times." Pet. Ex. 12 at 592. During his physical examination it was noted that petitioner was alert, oriented, normal sensory, had 4 out of 5 strength in all extremities, and did not have any focal or lateralizing weakness. *Id*. at 593. Petitioner was admitted to the hospital. *Id*. at 594.

On February 23, 2017, petitioner was examined by neurologist Dr. Shtrahman, and the follow up exam showed increased dysarthria, dysphonia, and new bilateral moderate facial weakness. Pet. Ex. 12 at 578. Under "diagnosis" Dr. Shtrahman wrote "clarification of the presenting history and reexamination pointed to a mostly bulbar presentation of a neuromuscular disorder such as myasthenia gravis, GBS, or motor neuron disease." *Id*. Given the fact that his condition was worsening, IVIG treatments were ordered. *Id*.

On February 24, 2017, petitioner started IVIG and was transferred to the intensive care unit with suspected GBS. Pet. Ex. 12 at 586, 683. Petitioner symptoms improved with IVIG treatments, and he was discharged on March 1, 2017, to acute inpatient rehab. *Id*. at 586.

On March 2, 2017, Dr. Shtrahman examined petitioner. Pet. Ex. 12 at 470. Under mental status it is noted that petitioner was "alert and oriented with fluent but dysarthric, dysphonic speech." *Id*. Petitioner showed "mild to moderate bilateral facial weakness, neck flexors are 5 minus/5." *Id*. Under motor it was noted that petitioner showed "upper extremities 5/5, lower extremities 5/5 except for limited examination of the left proximal muscles due to [recent] knee surgery (at least 3/5)." *Id*. Dr. Shtrahman noted petitioner was likely suffering from "bulbar variant of GBS," and ordered an EMG nerve conduction study. *Id*.

On March 3, 2017, petitioner was seen for physical therapy and on exam had nystagmus, and 4/5 strength in the extremities with limited activation, and range of motion in his left knee was limited due to pain. Pet. Ex. 12 at 377. On March 9, 2017, petitioner underwent an EMG/NCS which showed sensorimotor demyelinating peripheral neuropathy without signs of ongoing denervation or axonal loss, chronic left C8 radiculopathy, and no signs of a defect in neuromuscular transmission – the assessment was GBS. Pet. Ex. 14 at 8. On March 9, 2017, the

physical therapist noted petitioner was suffering from left knee pain, fatigue, and double vision. Pet. Ex. 12 at 476.  Petitioner was discharged with a diagnosis of GBS, uncontrolled diabetes mellitus, and left knee degenerative joint disease. Pet. Ex. 12 at 382.  He was ambulating with a walker and a cane.  *Id*. at 424.

Petitioner restarted physical and occupational therapy through UPMC Home Health on March 21, 2017. Pet. Ex. 11 at 20, 105. The focus of the physical therapy was abnormality of gait due to left knee degenerative joint disease, and GBS related sequelae. *Id*.  Petitioner was homebound with mobility issues, he became short of breath after walking 20 feet, and was ambulating with a wheeled walker.  *Id*. at 28, 47. Petitioner underwent speech therapy assessment and was found to be functioning well.  *Id*. at 139.  On April 6, 2017, it was noted that petitioner had a wide-based unsteady gait and was ambulating with a cane.  *Id*. at 64.  Petitioner was discharged from occupational therapy on April 7, 2017.  *Id*. at 134.

When petitioner presented to Allegheny Health Network for a follow-up on April 6, 2017, his blurred vision he had with GBS was resolved.  Pet. Ex. 19 at 130. His neurologic exam was positive for weakness, and he continued to ambulate with a walker.  *Id*. at 130-131. Under History of Prior Illness, petitioner was listed as having post-operative pain from left knee surgery, GBS with rehab three times a week, and generally atrophy in his muscles. *Id*. at 129.

Petitioner presented to Allegheny Health on May 10, 2017, for a follow-up appointment for left extremity swelling, right sided sciatica, and hyperlipidemia.  Pet. Ex. 19 at 165.  It was noted that petitioner used a walker ever since his left knee surgery and that his "recovery post-op was thwarted by [GBS], this has made additional muscle weakness a challenge, [physical therapy] working more on generalized weakness than [left] knee." *Id*. at 166.

On June 28, 2017, petitioner had a bone scan for right-sided thoracic pain, and the scan showed "right anterior seventh, eighth, and ninth thoracic rib fractures; slightly increased activity around the recently placed left knee prosthesis that was compatible with postoperative change; and multifocal degenerative arthritic change." Pet. Ex. 12 at 309.  Petitioner underwent arthroscopy of the right knee on October 10, 2017.  Pet. Ex. 27 at 967-70.

On October 24, 2017, petitioner presented to the emergency department with right leg pain and swelling.  Pet. Ex. 27 at 916-917.  His assessment noted "postoperative right lower extremity edema and right leg Baker cyst and postoperative pain," he was discharged. *Id*. at 917.

On December 8, 2017, petitioner presented to Dr. Provanzono, at Pain Diagnostic & Interventional Care for pain management related to lower back pain, right leg pain, and "neuropathic complaints in his legs since the GBS." Pet. Ex. 5 at 2. Dr. Provanzono reviewed the MRI from December 2, 2017, and noted that "I believe some of his symptoms are from the GBS." *Id*. at 3.

On June 11, 2018, petitioner underwent total right hip arthroplasty.  Pet. Ex. 15 at 9. Petitioner received post-operative care at Lutheran Senior Life from June 13 to June 29, 2018. Pet. Ex. 23. On June 26, 2018, petitioner presented to TriState Orthopedics and reported right hip pain. Pet. Ex. 15 at 8.  He was ambulating with a walker and came into the office in a wheelchair

due to his inability to ambulate long distances. *Id*. On August 28, 2018, petitioner returned to TriState Orthopedics. Pet. Ex. 15 at 5. Petitioner was ambulating without a cane and not using pain medication, he denied numbness or tingling, and continued with physical therapy, noting that he felt tired after the sessions. *Id*.

Emergency medical services responded to a call from petitioner on November 20, 2018, with complaints of weakness in both legs. Pet. Ex. 24 at 6; Pet. Ex. 27 at 745. Petitioner was unable to stand, and "had a fall the day of admission... he was on the couch and went to stand up [and] was unable to hold his own weight and fell to the floor. He reports that his wife [was] unable to get him up off the floor [and] EMS was summoned." Pet. Ex. 27 at 749. Petitioner was admitted to the hospital and reported increased bilateral leg pain from the calves down and increased weakness for the past two-three days. Pet. Ex. 27 at 745-747. Petitioner was discharged on November 20, 2018. *Id*. at 770.

On May 28, 2021, petitioner was seen by Dr. Kasdan, a neurologist. Pet. Ex. 46. Dr. Kasdan noted that petitioner's diabetes was not well controlled, and that while petitioner had improved after his initial diagnosis of GBS, he was not back to baseline. Pet. Ex. 46 at 3. Dr. Kasdan notes, "Thomas Creely had a problem with his left knee, but prior to this left knee surgery in February 2017 he ambulated without a walker or assistance. He has not done that ever since and his deficits are not related to the knee surgery but to the development of GBS following a flu vaccine he received immediately after surgery." *Id*. at 3. Dr. Kasdan notes that petitioner has,

...clear cut objective evidence of neuropathy on clinical testing which includes sensory loss in his feet and absent ankle reflexes. Because of the onset of this neuropathy came literally days after had had the flu vaccine, it has been agreed upon by all involved in his care that the flu vaccine led to GBS....the post-vaccine Guillain-Barré that occurred in February 2017 is responsible for his ongoing physical limitations. *Id*. at 3.

On June 10, 2021, petitioner was diagnosed with malignant neoplasm of the prostate. Pet. Ex. 54 at 37. By October 2021, petitioner's cancer had progressed to skeletal metastatic disease. *Id*.

On July 20, 2021, petitioners life care planner, Nancy J. Bond, participated in a virtual site visit with petitioner, his wife, and their friend Ms. Mary Wildman. Pet. Ex. 47 at 2. The narrative report noted that petitioners "...limited mobility has precluded him from fully participating in several family gatherings." *Id*. at 6-7. Nancy Bond noted that petitioner "continues to have difficulty walking due to pain in his right leg and feet as well as weakness in both of his legs. Mr. Creely uses a walker for ambulation around his home." *Id*. at 7. He lives on the first floor of his home, "as he cannot navigate the stairs to the second floor of his home where his bedroom and a full bathroom are located. Mr. Creely has not had a shower for nearly four years." *Id*. at 8. Petitioner "sleeps in a hospital bed that is in his living room of the home," and his wife sleeps on the couch nearby so she can be available to her husband as needed. *Id*.

On November 16, 2021, respondents life care planner, Laura Fox, participated in a virtual site visit with petitioner. Resp. Ex. A at 1. The life care plan noted that petitioner has "difficulty walking, pain, numbness, weakness, and ambulates with a cane and walker. He now has difficulties performing his self-care and does not drive. *Id.* at 7. The report noted that although petitioner had made some improvements since his initial diagnosis of GBS, he has never fully recovered. *Id.* at 6.

## IV. Pain and Suffering

### A. Legal Standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000." 42 U.S.C. § 300aa-15(a)(4). With regard to pain and suffering and all other elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition. *See, e.g., Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries. *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007). In *Graves,* Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent". *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013). Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap. Only then as a second step, if the award would exceed $250,000, it must be reduced to that maximum. *See id.* at 589-90.

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.[4] However, they have found it to be persuasive. *See, e.g., I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL

---

[4] Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998). In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach. I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

**B. Petitioner's Position**

Petitioner requests an award of $250,000.00 for past pain and suffering. Petitioner's ("Pet.") Memo at 12-13. Petitioner avers that his "life was utterly taken from him by his GBS" after the flu vaccination. *Id*. at 12. Petitioner asserts that "he has never returned to baseline [and] lives in a constant state of fear of embarrassment or humiliation." *Id*. Petitioner has had to "watch his wife's health deteriorate as a result of caring for him…[and] can no longer participate in *any* of the things that used to bring him joy." *Id*.

Petitioner argues that before the flu vaccination he was an active and healthy 75-year-old and was expected to continue working after getting the left knee replacement surgery. Pet. Memo at 6-7. Petitioner noted that on January 30, 2017, the day before the knee replacement surgery, petitioner worked a full day at the pizza shop, and "was able to perform all the duties necessary at the pizza shop, without restrictions or difficulty." Pet. Ex. 51 at 1; Pet. Memo at 8.

Petitioner explains that he had multiple falls due to his GBS, two of which necessitated response by emergency medical services on February 22, 2017, and November 20, 2018. Pet. Ex.

9 at 45; Pet. Ex 27 at 745. Petitioner stated that he started to experience symptoms of GBS beginning on February 17, 2017. Pet. Ex. 9 at 44; Pet. Aff. ¶ 4.

Petitioner filed an affidavit, along with statements from his wife, and their close friend to provide support for how he has been affected by his vaccine injury. *See* Pet. Ex. 13; Pet. Ex. 49; Pet. Ex. 50; Pet. Memo at 2-3. These statements discussed the facts, events, and circumstances relating to petitioner's life following the vaccination at issue.  Petitioner has also filed complete medical records. *See* Pet. Exs. 2-12, 14-16, 18-20, 23-28, 45-47, 50, 56-57. Additionally, a virtual onsite visit occurred on July 20, 2021, with petitioner's life care planner with a video recording of petitioner's home. Pet. Ex. 47, 50. Petitioner argues that together, the use of affidavits, medical records, and the video addendum to the life care plan – creates a detailed social and medical history presenting the before and after picture of petitioner's life since his onset of GBS and his current living conditions. Pet. Mot. at 3.

Petitioner cited to *Dillenbeck*, which addressed the use of affidavits and fact witnesses within the context of determining an award for pain and suffering and emotional distress. *Dillenbeck v. Sec'y of Health & Hum. Servs.,* No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. July 29, 2019), *aff'd in part and remanded*, 147 Fed. Cl. 131 (2020).  Petitioner also noted that Special Master's may also consider prior pain and suffering awards from other special master in their own decisions. *See Doe 34* v. Sec'y of Health & Human Servs., 87 Fed. Cl. 758, 768 (2009), *Hodges* v. Sec'y of Health & Human Servs., 9 F.3d 958, 961 (Fed. Cir. 1993).

Petitioner cited to multiple recent cases within the Vaccine Program in which individuals suffered from GBS as a result of a flu vaccine, and received pain and suffering awards between $150,000.00 and $180,000.00. *See McCray v. Sec'y of Health & Hum. Servs.,* No. 19-0277V, 2021 WL 4618549, at *3 (Fed. Cl. Aug. 31, 2021); *Gross v. Sec'y of Health & Hum. Servs.,* No. 19-0835V, 2021 WL 2666685, at *3 (Fed. Cl. Mar. 11, 2021), review denied, 154 Fed. Cl. 109 (2021); *W.B. v. Sec'y of Health & Hum. Servs.,* No. 18-1634V, 2020 WL 5509686, at *4 (Fed. Cl. Aug. 7, 2020), *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012, at *6–7 (Fed. Cl. July 20, 2018); *Devlin v. Sec'y of Health & Hum. Servs.,* No. 19-0191V, 2020 WL 5512505, at *4 (Fed. Cl. Aug. 7, 2020); *Dillenbeck,* No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. July 29, 2019).  The cases cited by petitioner described impairments significantly less than those suffered by Mr. Creely.

In another case petitioner cited, *Wilson,* the petitioner was awarded $175,000.000 in pain and suffering after enduring a significant initial hospital course, but after a period of approximately six months he was largely recovered, and the limitations mainly impacted his leisure activities as he was already retired. *Wilson v. Sec'y of Health & Hum. Servs.*, No. 20-588V, 2021 WL 5143925, at *5 (Fed. Cl. Oct. 5, 2021).

Petitioner pointed to the several instances in the medical records which indicate that he was an extremely active and healthy 75-year-old man prior to receiving the flu vaccine on February 2, 2017.  Pet. Aff ¶ 1. Petitioner explained that he not only owned and operated a pizza shop, but he worked there seven days a week and performed all responsibilities, including cooking, food preparation, deliveries, front counter, and inventory control. *Id*. Petitioner's wife, Mrs. Donna Creely, explained that they have been married 51 years, and stated that "On January 30, 2017, the day before left total knee replacement, he worked all day at the pizza shop…he was

fully able to perform all the duties necessary at the pizza shop, without restrictions or difficulty." Pet. Ex. 51¶ 3. Petitioner also stated that the witness statement from Mary Wildman, a long-time family friend and noted that petitioner "always seemed to be in great physical health." Pet. Ex. 49 at 1.

Petitioner's wife stated that, "immediately after the surgery he was ready to go back to the pizza shop. Pet. Ex. 51 ¶ 4.  On February 22, 2017, petitioner was so weak he was unable to stand and fell backwards on his wife.  Pet. Ex. 12 at 2.  Upon admission to University of Pittsburgh Passavant hospital, petitioner started on IVIG treatments and was transferred to the ICU for an increase in dysarthria and dysphonia. Pet. Ex. 12 at 470, 683.  In June 2017, petitioner's bone scan showed he had rib fractures, which were broken as a result of multiple falls due to his GBS. Pet. Ex. 12 at 309.  In December 2017, petitioner complained of neuropathic pain in his legs since the GBS diagnosis and as recently as May 2021 he complained of ongoing GBS pain, weakness, and physical limitations. Pet. Ex. 5 at 2; Pet. Ex. 46.

Petitioner argued that beyond the medical record there is testimonial evidence from petitioner's Life Care Planner, Nancy Bond. Pet. Ex. 47. The life care plan noted that petitioner placed a hospital bed in his living room, as their bedroom was upstairs, and he was unable to go up stairs immediately following his surgery. Pet. Mot. at 9.  The bed had been borrowed from a neighbor contemplating a short term need for it while completing physical therapy for the knee replacement. However, after the onset of GBS he has never been able to ascend the stairs again and sleeps in the living room of their home which is now dominated by a hospital bed and a chair holding his clothes.  Petitioner's wife "sleeps on a couch nearby so that she can be available to her husband if needed overnight." Pet. Ex. 47 at 8. Petitioner does not have a set sleeping schedule because he wakes up in the middle of the night in pain, waking his wife, and then naps throughout the day. Pet. Mot. at 10. Petitioner's wife only leaves the house during the day while petitioner is napping, and will notify a neighbor in that event in case he needs assistance. Pet. Mot. at 10; Pet. Ex. 47 at 8. Petitioner noted that at the time this motion was filed on March 18, 2022, petitioner is still sleeping in the living room. *Id*.

Petitioner has been unable to fully bathe or shower in nearly four years, and instead is bathed daily in the first-floor half bathroom with soap and water and his wife washes his hair in the kitchen sink.  *Id*. at 9-10. Petitioner's wife helps petitioner get dressed on days when he is experiencing weakness and he has switched permanently to slip on shoes in order to not have to bend over and tie the laces. Pet. Ex. 47 at 8. Additionally, petitioner is continent, but wears adult diapers because he cannot always get to the bathroom in enough time. This has limited their ability to leave their home, and has resulted in some embarrassing situations. Pet. Ex. 47 at 8; Pet. Ex. 51 ¶ 8-9.

Ms. Wildman, a family friend of over 20 years described at length that Mr. and Mrs. Creely and Donna had been hard working people, running the pizza business and were outgoing and social prior to February 2017.   She noted as recently as July 14, 2021, that she witnessed petitioner "struggle to lift himself to get up from the loveseat he was sitting in and then exert great effort to walk (using a walker) from their family room (off the kitchen) to the powder room on the other side of the kitchen. [Petitioner] cannot walk without a walker; he cannot walk without taking breaks; and he is in terrible pain. He is exhausted to walk even as little as 15 feet" Pet. Ex. 49 at 1. The same day Ms. Wildman witnessed petitioner  have diarrhea without making

it to the bathroom in time and she noted that, "I know he was embarrassed and humiliated because it happened while I was there. His wife had to help clean him up. They both just kept apologizing for this mishap…their dignity has been taking from them all because of GBS." *Id*. at 2.

Petitioner argues that he has never returned to baseline, lost his income, his principal contact and engagement with the community, and lives in a constant state of fear and embarrassment or humiliation. Pet. Mot. at 12.  Further, petitioner has watched his wife's health deteriorate as she cares for him, and he has gone from a "strong and  independent  husband, father, and grandfather to being completely and totally dependent." *Id*.

## C.  Respondent's Position

Respondent avers that the facts of the case and the pertinent legal and policy considerations support an award of past pain and suffering of $150,000.00. Resp. Response at 7. Respondent avers that petitioner had multiple preexisting medical conditions prior to his GBS diagnosis, and that his recover from his GBS was slowed by his unrelated orthopedic operations and a diagnosis of malignant neoplasm of the prostate. *Id*. at 9-10.

Respondent cited to three cases in the vaccine program that demonstrated an interpretation of pain and suffering awards are "for those who are both the most severely injured and who actually have suffered or will suffer the most pain, suffering or emotional distress." *See Stotts v. Sec'y of Health & Hum. Servs.*, No. 89-108V, 1990 WL 293856, at *16 (Cl. Ct. Spec. Mstr. Oct. 11, 1990), aff'd in part and rev'd in part on other grounds, 23 Cl. Ct. 352 (1991); see *Riley v. Sec'y of Health & Hum. Servs.*, No. 90-466V, 1991 WL 123583, at *5 (Cl. Ct. Spec. Mstr. June 21, 1991) (agreeing with Stotts); *Long v. Sec'y of Health & Hum. Servs.*, No. 94-310V, 1995 WL 470286, at *12 (Fed. Cl. Spec. Mstr. July 24, 1995) ("In [the Special Master's] view, under the Program, amounts at or near the $250,000 'cap' should be reserved for individuals who have suffered the worst types of injuries, especially brain damage.").

Respondent argued that the scope of damages to be awarded should be limited to petitioner's GBS and its related sequalae. Resp. Response at 8. Respondent does not question the medical records and explains that in the vaccine program there has been a wide spectrum of cases involved varying sequelae for GBS injuries. Respondent cited to *Dighero*, in which the pain and suffering award was *$250,000.00*, along with other damages. *Dighero v. Sec'y of Health & Hum. Servs.*, No. 15-22V, 2017 WL 5246562 (Fed. Cl. Spec. Mstr. Oct. 19, 2017). Respondent argues that these other factors were indicative of the severity of that case. Resp. Response at 8-9.

Respondent argues that by April 6, 2017, petitioner's vision issues from GBS had resolved, he had completed outpatient physical therapy, and was able to use a cane and walker to ambulate. Pet. Ex. 11 at 64, 134. Between April 2017 and June 2018, petitioner underwent right knee arthroscopy and a right hip replacement. Pet. Ex. 27 at 967-970; Pet. Ex. 15 at 9. Respondent noted that petitioner "continued to have GBS related sequelae as evidenced by his continued complaints of neuropathic pain his legs [since] his diagnosis of GBS." Resp. Brief at 9.

Respondent observed that petitioner's May 28, 2021, visit with Dr. Kasden noted that petitioner had no complaints of sensory symptoms in his hands, but did complain of sensory symptoms in his feet, along with being unable to ambulate more than 20 feet. Pet. Ex. 46 at 3. Respondent also observed that Dr. Kasden noted petitioner "had made improvements regarding his ability to ambulate, but had never returned to baseline from prior [due] to his GBS." Resp. Brief at 9; Pet. Ex. 46 at 3.

Despite acknowledging that as recently as an appointment in May 2021, petitioner's treating physician acknowledged that petitioner had not returned to his baseline from before the onset of his GBS, respondent argued that $150,000.00 is an appropriate amount to compensate for pain and suffering in this case. Resp. Brief at 9. Respondent argues that "The privacy provisions of the Vaccine Act make a true head-to-head comparison of this case to others difficult." *Id.*

Respondent argued that the *Wilson* case, which petitioner cited to, was not a comparable GBS case because the petitioner in that case did not have a significant medical history prior to GBS. *See Wilson v. HHS*, No. 20-588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021). Respondent argues that petitioner in *Wilson* did not have a significant medical history prior to his GBS, he was initially hospitalized for two weeks in the ICU, and his respiratory condition deteriorated to the point of having to be intubated for a week. *Id.* Respondent argues that "in contrast, petitioner did have significant history prior to his GBS..[and his] recovery from his GBS was slowed by his unrelated orthopedic operations after his GBS and a diagnosis of malignant neoplasm of the prostate." Resp. Response. at 10.

**V. Discussion and Conclusion**

As noted above, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9. Impairment of function and loss of activities are also considered. Here, petitioner's awareness of his injury is not disputed. The record reflects that at all relevant times, petitioner was a competent adult with no impairments that would impact his awareness of his injury. Thus, the focus must be on the severity of his injury, its duration, and any impairments in function and loss of activities

On February 13, 2017, 11 days after the flu vaccination, and 13 days after his left knee total arthroplasty, petitioner was discharged from inpatient rehabilitation, and he was ambulating with a wheeled walker and reported he was doing well with his therapies. Pet. Ex. 10 at 5, 16, 20. At this point petitioner was at his home, confined to the first floor as was directed after the left knee surgery. Petitioner stated that he started to experience symptoms of GBS beginning on February 17, 2017. Pet. Ex. 9 at 44; Pet. Aff. ¶ 4. On February 22, 2017, petitioner was admitted to the hospital with symptoms of diplopia, weakness, achiness, and low back pain that began five days earlier on February 17, 2022. Pet. Ex. 12 at 547, 592-594. On February 24, 2017, petitioner was treated with IVIG for suspected GBS and transferred to the intensive care unit. *Id*. at 586, 683. Petitioner was discharged on March 1, 2017, to acute inpatient rehabilitation and continued to get care for the "likely bulbar variant of GBS." *Id*. at 470. After nearly thirty days in care, petitioner was discharged home with a diagnosis of GBS, uncontrolled diabetes mellitus, and left

knee degenerative joint disease. *Id*. at 382.  Petitioner has largely been confined to the first floor of his house since this day – over five years ago – because of his inability to navigate stairs in his home.

Treatment can also illustrate the severity of an injury.  Here, viewing the record as it stands over five years after the onset of petitioner's GBS, petitioner has been incredibly compliant with physical and occupational therapy appointments, neurology appointments, pain management appointments, and primary care appointments. Additionally, petitioner has had multiple falls due to his GBS, two necessitated emergency medical services on February 22, 2017, and November 20, 2018. Pet. Ex. 9 at 45; Pet. Ex 27 at 745. One of the falls resulted in rib fractures, and the other resulted in petitioner falling backwards onto this wife. Pet. Ex. 12 at 2, 309. Whether his subsequent need for a hip replacement was caused by the falls or not is unclear to me.

Further, petitioner has demonstrated a dramatic change in his  and his wife's life since the time of his GBS diagnosis secondary to the impairments caused by GBS.  Petitioner and his wife were actively operating a pizza shop the day before petitioner was admitted for his left knee total arthroscopy on January 30, 2017.  It was a physically demanding business, and petitioner was performing  all responsibilities, including cooking, food preparation, deliveries, front counter, and inventory control, "without restrictions or difficulty." Pet. Aff ¶ 1; Pet. Ex. 51¶ 3. It was clear that he and his wife's intention was to return to the operation of the business after his knee replacement, even if the recovery would have taken more than a few days as was suggested. Petitioner was described by Ms. Wildman as being "incredibly active and fun and social," before the GBS diagnosis, and was described to feel "drained, hopeless and isolated," following the GBS diagnosis.

The affidavits from petitioner and his wife, the witness statement from Mrs. Wildman, the life care plan and accompanying video of petitioner's home provide a more comprehensive picture of the severity and duration of his GBS and therefore the pain and suffering that he has endured.  Petitioner intended to temporarily borrow the hospital bed following his total knee replacement on January 31, 2017, because he would not be able to go up the main stairs in his home immediately following his surgery, a normal request after such an orthopaedic surgery. However, petitioner remains in that borrowed hospital bed in his living room over five years later, and his wife sleeps on the couch to ensure petitioner's safety at night. Pet. Ex. 47 at 8. Additionally, due to petitioner's inability to access the second floor, he has not been able to fully bathe or shower since January 2017, and his wife bathes him in the first-floor half bathroom. Pet. Ex. 47 at 8; Pet. Ex. 51 ¶ 8-9. Mrs. Wildman's description of petitioner's struggle to get to the bathroom, having to have his wife raise and lower his diaper, and the humiliation of having an accident while she was there is significant towards the analysis of severity and duration of his GBS symptoms, as this *one* incident occurred in July 2021.  Pet. Ex. 49.

The respondent points to a "significant medical history prior to his GBS," and to comorbidities such as the knee condition necessitating knee replacement surgery that occurred a few weeks before the onset of GBS. Pet. Ex. 12 at 578, 792.  However, the medical record indicates that petitioner had  knee replacement surgery on January 31, 2017, and while hospitalized received the flu vaccination in question on February 2, 2017. Pet. Ex. 1; Pet. Ex. 12

at 792.  As indicated by petitioner and his wife, petitioner was motivated to return to work after the knee replacement surgery, and seemed to have a good recovery of function of the knee following a period of physical therapy with continued exercise.  Petitioner's recovery was demonstrably impaired by the onset of GBS, and it does not appear that he has ever recovered. During a May 10, 2017, visit to the Allegheny health network in which it was noted that petitioner's "recovery post-op was thwarted by [GBS], this has made additional muscle weakness a challenged, [physical therapy] working more on generalized weakness than [left] knee." Pet. Ex. 19 at 165-166. On May 28, 2021, petitioner was seen by Dr. Kasdan, and he noted that "…the post-vaccine Guillain-Barré that occurred in February 2017 is responsible for his ongoing physical limitations." Pet. Ex. 46 at 3.

Respondent cites to 25-year-old cases from the vaccine program, all before the decision in *Graves,* which as described above is a persuasive decision suggesting that special masters should calculate the *total* pain and suffering award appropriate before applying the cap, rather than treating the cap as setting an absolute range of possible amounts and working solely within it. *See, e.g., Graves v. HHS.,* 109 Fed. Cl. 579, 590 (2013); *Desai v. Sec'y of Health & Hum. Servs.,* No. 14-811V, 2020 WL 8768069, at *7 (Fed. Cl. Dec. 21, 2020) ("In *Graves,* Judge Merow rejected the Special Master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory cap of $250,000.00); *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("... special masters appear to have accepted *Graves*'s methodology since issuance of that decision... I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I have also followed Judge Merow's decision in *Graves* and will do so in this case as I find its reasoning persuasive and I do not believe that petitioners with severe pain and physical impairments should be further limited in their recovery than the statutory cap by comparing their harm to the hypothetical worst case ever and down grading the award from there.

Petitioner cited to *Wilson,* in which petitioner was awarded $175,000.00 for actual pain and suffering.  The petitioner in *Wilson* alleged that he suffered GBS because of the flu vaccine. He was initially in the ICU for two weeks, followed by a five-week rehabilitation hospital stay, wheelchair bound for three months following inpatient rehabilitation, and his treatment included a lumbar puncture, an EMG, five sessions of PLEX, catheters, feeding tubes, a cardiac arrest, intubation, pain medication, sedatives, ST, PT, OT, and months of paralysis. *See Wilson,* No. 20-588V, 2021 WL 5143925, at *3 (Fed. Cl. Oct. 5, 2021).  By March 2020, petitioner had dramatic improvement, nearly regaining full strength, and by August 2020 he had regained full strength

and motor function.  *Id.* at *2.  Chief Special Master Corcoran noted that petitioner's presentation and treatment history were acute, petitioner had a reasonable recovery and that the main impact on the petitioner was his enjoyment of leisure activities, because he was retired.  *Id.* at *5.  Special Master Corcoran noted that "There is, however, a qualitative distinction between someone who is retired and experiences GBS versus someone who is employed and experiences those same challenges to an extent that their employment is negatively impacted. And while a lost wages claim will provide direct compensation, the more intangible effects of a vaccine injury preventing a person from working as before *does* bear on pain and suffering as well." *Id.* at *5.

    In contrast to *Wilson*, the petitioner in this case has chronically lived with substantial impairments from GBS for over 5 years.  Petitioner's initial hospital stay related to the GBS lasted seven days, started on IVIG, and then was discharged to acute inpatient rehabilitation where he stayed for nineteen days.  On May 10, 2017, it was noted that "recovery post-op was thwarted by [GBS], this has made additional muscle weakness a challenge, [physical therapy] working more on generalized weakness than [left] knee." Pet. Ex. 19 at 166.  On May 28, 2021, Dr. Kasden, a neurologist wrote, "the post vaccine GBS that occurred in February 2017 is responsible for petitioner's ongoing physical symptoms." Pet. Ex. 36 at 3.  Unlike the petitioner in *Wilson,* where that petitioner made an almost full recovery, the petitioner's medical records in this case demonstrate ongoing and chronic symptoms and impairments caused by GBS.

    While petitioner is not seeking lost wages, petitioner makes clear that he and his wife had every intention of returning to their pizza shop after the left knee surgery and instead had to sell the business due to petitioner's complete inability to work.  Respondent also does not discuss the hardships that petitioner and his wife have had within their home, the inability for him to ambulate long distance or use the stairs which has confined him to the first floor of his house for over 5 years.  He cannot sleep in his own bed, but instead a hospital bed in the living room, he cannot take a shower, and instead his wife bathes him in a half bathroom. These facts are relevant to petitioner's pain and suffering and indicate lingering sequalae from petitioner GBS are apparent to this day.

    Petitioner certainly had some co-morbidities, however, the GBS has, in my view dominated the picture of petitioner's life since February 2017. It is significant that he worked delivering pizzas the day before his knee replacement surgery which is designed to relieve knee pain.  While it may have taken longer than a few days to return to work at their pizza shop, the purpose of the surgery was to relieve pain and improve function.  This likely would have occurred but for the onset of GBS.  Petitioner was a diabetic but had been for years and nevertheless maintained an active lifestyle and worked seven days a week.  His later development of prostate cancer does not have any bearing on his neurological impairments caused by GBS.

    Petitioner's GBS has impaired the normal recuperation from knee replacement surgery, forced him and his wife to prematurely close their business, completely changed their personal and social life, and on a daily basis has caused severe impairments resulting in the inability to do stairs, inability to ambulate long distances, suffering multiple falls, inability to sleep in his second floor bedroom, inability to utilize the second full bathroom for bathing or sleep in the

couple's bedroom, and subjected to significant problems related to his bowel movements. He has suffered with GBS for upwards of five years, and there appears to be no apparent relief.

**IV. Conclusion**

Regardless of awards in other cases, the facts and circumstances of each case have to be evaluated individually. The same disease affects different people in many different ways with some having relatively rapid recoveries or minor long-term impairments and others being more severely affected.  In this case, the petitioner has suffered significant pain and impairment of function that forced him to sell the family pizza business which he and his wife had run for 17 years, and his impairments have demonstrably impacted their social life and virtually all activities of daily living to the present day.  I have carefully reviewed the medical records, affidavits, witness statements, and life care plans in this case.  Upon review of the complete record and assessment of the level of harm suffered by petitioner secondary to GBS, I find that an award of $250,000.00 for past pain and suffering to be reasonable.

The parties shall file a proffer that is consistent with this ruling, along with other agreed upon terms from the life care plan, within thirty days to resolve the damages of this case.

**IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master